## SHIVELY v. PARKER.

### FRAUD—EQUITABLE RELIEF.

In the consideration of fraud, whether actual or constructive, courts of equity have adopted principles exceedingly broad and comprehensive in the application of their remedial justice; and especially where there is fraud concerning property, they will often interfere and administer a wholesome and sometimes a strict justice, in favor of innocent persons, who are themselves without fault in the transaction.

### BREACH OF DUTY—UNDUE INFLUENCE.

The cases to which this doctrine has been held applicable are generally cases where there is some breach of duty, or want of good faith and fair dealing on the part of the person acquiring the property, or of him from whom, or under whom, he has gotten it, of which he has actual or constructive notice, or where the property has been acquired, or the possession of it taken, on the assumption of a trust character, or under the belief by those with whom the transaction is had, or by reason of which it was acquired or possessed, that it was taken or acquired in trust, or where it had been gotten by some undue influence.

APPEAL from Clatsop.

*William Strong & Sons*, for appellant.

*Dolph, Bronaugh, Dolph & Simon*, for respondent.

By the Court, LORD, C. J.:

This is an appeal from a decree in equity, sustaining a demurrer to the complaint, and dismissing the same for want of equity.

The object of the suit is to have the defendants decreed to hold the legal title of certain lots and blocks purchased by them from the state, in trust for plaintiff. The lands in question are alleged to be tide lands, lying between ordinary low water mark and ordinary high water mark in the Columbia river.

It is admitted that Nancy Welch was the owner of the lands upon the shore, in front of which these tide lands are situated, and that the water lots were purchased from the state by her, or those claiming under her, by virtue of this ownership of the shore, under the provisions of the act of the legislature of the state of Oregon, approved October 28, 1872, known as "the tide land law."

The material allegations of the complaint upon which the prayer for relief is based, are briefly, in substance: That in March, 1844, plaintiff settled upon a tract of 640 acres of land, which includes the said shore lots, in front of which the tide lands in controversy lie, and that in said month, plaintiff laid out a portion of the tract into blocks, numbered 1 to 121, and made a map of the same, known as "Plan of Astoria, laid off in March, 1844," and called "Shively's Astoria." That on April 18, 1845, he sold and conveyed an undivided one-half interest in the entire tract to James Welch. That prior to March 13, 1850, plaintiff, with the knowledge and consent of said Welch, added to said plat other blocks, numbered from 122 to 150, " located almost exclusively upon the shore of the Columbia river, between ordinary high and low water mark;" and that on March 13, 1850, plaintiff and Welch, " believing themselves to be each the owner of an undivided half of said lands," proceeded to divide the lots and blocks between them by each executing to the other a quitclaim deed to the blocks thus described and set apart to the other.

That after the passage of the donation law, plaintiff, with the knowledge of Welch, was recognized as the proper claimant of the entire tract by the officers of the land department,

and that plaintiff was thereafter "the only person entitled to claim said donation land claim," but that Welch continued wrongfully to claim rights therein. "and contested the application of plaintiff for a patent;" to settle which contest and other disputes about the effect of said agreement of April 18, 1845, and March 13, 1850, plaintiff and Welch, on February 18, 1860, entered into an agreement by which said land was to be divided between them, etc., and that plaintiff and wife should convey to Welch, or to such person as he should designate, the lots, blocks and lands coming to him, and that on February 18, 1860, plaintiff and wife conveyed to Welch, by warranty deed of that date, the west half of 200 acres of land, etc., and by another warranty deed of same date, plaintiff and wife conveyed to Nancy Welch the east half of said 200 acres of land and a number of said blocks, among which are blocks 5 and 9, in front of which the tide lands, or blocks, in controversy are located.

"That said warranty deeds were intended to be and were a full settlement of all the respective parties' claims to said land claim, and were so accepted by the said Welch, who, in consequence thereof, withdrew the opposition which he had previously made to the claim of plaintiff to the patent for said land." That Nancy Welch paid no consideration for the property conveyed to her, but the same was a gift from her said husband; that at the time of the division so made, it was intended by the parties to make a full and final division of said land claim, together with its appurtenances, including riparian rights on the Columbia river, and that on January 24, 1866, patents issued to plaintiff and wife for said land.

That on March 29, 1876, defendants, being the owners of said block 9, and the east half of block 5, by deed from Nancy Welch, purchased as tide lands from the state, block 141, in front of block 9, and the east half of blocks 145, 41 and 46, in front of said east half of block 5, and that at that time plaintiff was also an applicant to purchase said block 141, and the east half of blocks 145, 41 and 46, from the state, as tide

lands, and was the equitable owner thereof, which was well known to Nancy Welch, and the title of defendants to said tide lands is fraudulent and void as to plaintiff, for the reason that when they procured their deed from her to block 5 and 9, they well knew and were fully informed of the premises, and that defendant should be declared to hold said title in trust for him, and decreed to convey, etc.

Upon this state of facts, conceded to be true by the demurrer, the question in this case is, has Shively the superior equity as against the legal title? If he has, then it is the duty of the court to regard the defendants as the trustees of that title for the benefit of Shively, and to decree it out of them for Shively's benefit.

In the consideration of fraud, whether actual or constructive, courts of equity have, as stated by Judge Story, adopted principles exceedingly broad and comprehensive in the application of their remedial justice, and especially where there is fraud concerning property, they will often interfere and administer a wholesome and sometimes even a strict justice in favor of innocent persons, who are themselves without fault in the transaction. (Story's Equity Jurisprudence, section 1,265.)

Nor, in the application of these principles of remedial justice, will courts of equity hesitate to fasten upon the conscience of a party the duty of trustee in regard to property which has been acquired by artifice or fraud, or where either from the character of the property, or the circumstances under which it is acquired or held, it would be against equity to permit such party to hold it except as trustee.

It doubtless would be an impossible task to lay down any general rule which would be applicable to, or embrace every conceivable case in which a party would be held to be a constructive trustee. It is said, however, that the cases to which this doctrine of remedial justice of courts of equity has been held applicable, are generally cases " where there is some breach of duty, or want of good faith and fair dealing on the

part of the person acquiring the property, or of him from whom, or under whom, he has gotten it, of which he has actual or constructive notice; or when the property has been acquired, or the possession of it taken on the assumption of a trust character, or under the belief of those with whom the transaction is had, or by reason of which it was acquired or possessed, that it was taken or acquired in trust; or when it had been gotten by some undue influence." (Leading Cases in Equity, vol. 2, part 1, 549; Story's Eq. Jur., sec. 1,255, *et seq.;* Hill on Trustees, 242 and 246; 2 Wash. on Real Prop., 447.)

It now becomes our duty to enquire whether the facts alleged come within the range of these principles of remedial justice, and, in fact, are such that the court can see that equity and justice require that it should impose upon the conscience of the defendants the performance of the duty which is prayed for in the complaint.

The argument of the appellant. is, that it is immaterial whether the plaintiff be considered as the original owner of the adjacent lands, having made a reservation of the tide lands in controversy, or as owner in equity of the tide lands in the division made March 13, 1850, between plaintiff and Welch, he is entitled to the state deed. Or, in other words, that the effect of this division, by quit-claim deeds in 1850, was equivalent to a reservation of the tide lands in controversy in favor of the plaintiff, or to make him the equitable owner thereof, which in either case, gave plaintiff a prior right, or superior equity, to the lands in question, as against Welch, or those claiming under him with notice.

Now, prior to the interchange of these quit-claim deeds in 1850, plaintiff had deeded to Welch an undivided half interest in the entire tract of land which he claimed, with certain exceptions, enumerated in the deed, not pertinent to the matter under consideration. But this did not include the tide lands adjacent, nor was any claim to them made or considered in that contract, which quite clearly indicates that

plaintiff did not consider the tide lands any part or parcel of his land claim. The fact that subsequently plaintiff, with the knowledge and consent of Welch, laid off blocks out of these tide lands adjacent, to which neither had any title, and which, it must be presumed, both knew belonged to the United States, and proceeded to interchange quit-claim deeds with respect to such tide lands, and also their other lands, certainly did not have the effect to create any equities or reserve any rights in favor of one or the other in these tide lands. Nor were they doing this by reason of any mistake, or under any misapprehension of their rights or interests in the tide lands. They were charged with a knowledge of the law, and it must be presumed that they knew the tide lands belonged to the United States, and under the general policy pursued by the government, would revert to or belong to the state of Oregon when the then existing territory should be admitted into the union as a sovereign state. To this point there certainly is nothing in the circumstances of the transaction, as alleged, which indicates as between the plaintiff and Welch " any breach of duty, or want of good faith and fair dealing on the part of the person acquiring the property, etc.," to which the doctrine of remedial justice as applied by courts of equity would be invoked. Both enjoyed equal opportunities of knowledge; both were in the undoubted and full possession of their mental faculties, and both knew the tide lands in controversy, which had been platted, and which they had appropriated in the quit-claim division of 1850, did not belong to them, and, according to the facts alleged, did not constitute any part of the consideration for the undivided half interest of the original tract claimed by plaintiff and conveyed by him to Welch.

In the case of *Parker* v. *Rogers*, 8 Oregon R., 183, the bond of McClure, subsequently the donation patentee, contained a " full reservation of all and every privilege around said lot," and the deed of Olney, to whom McClure and wife had conveyed all their interest in their donation claim and all

the riparian rights appurtenant thereto, contained a reservation: "Exclusive of any wharfing privileges," and these express reservations in the conveyances formed the ground work upon which the case was decided. The original conveyance between plaintiff and Welch contained no reservation of this character, and from the facts alleged we must presume Welch succeeded to whatever riparian rights were appurtenant to his interest in the claim, and we can see nothing in the quit-claim transaction of 1850 analogous to or of equivalent force or effect to the fact in the case above cited.

But if we may suppose that the plaintiff and Welch anticipated that they would in some way acquire title from the United States to the lands in controversy at the time when they were contracting with regard to them, it must be observed that no understanding or agreement is alleged by which either party agreed that even if title were acquired from the United States by one party, that such title should be held in trust for the other, according to the map designations, or otherwise, and even if such agreement had existed and was alleged in connection with the other facts, it would not bring the case within the terms of such agreement. But be this as it may, there is still another view presented by the facts of this case, which we regard as decisive.

It appears that in 1860, upon the facts alleged, that difficulties and misunderstandings still existed between plaintiff and Welch, in respect to their land claim. The donation land law had passed in 1850, and plaintiff claimed that "he was the only person entitled to claim said donation land claim," but that Welch continued to claim rights therein and to contest the application of plaintiff for a patent; and to settle which contest and other disputes about the effect of their previous agreements, the plaintiff and Welch entered into an agreement, the result of which was that plaintiff and his wife conveyed by warranty deeds, on February 18, 1860, to Welch the west half of 200 acres of land in the southeast corner of said land claim, and a large number of blocks, and to Nancy

Welch, his wife, the east half of said 200 acres of land, and a large number of blocks, among which are blocks 9 and 5, in front of which the tide lands, or blocks in controversy, are located; and it further appears by the allegations, that their warranty deeds were intended to be and were a full settlement of all the "*respective parties*" claims to said land claim, and were so accepted and received by Welch, "who, in consequence thereof, *withdrew the opposition* which he had previously made to the claim of plaintiff to the patent for said land," and as a consequence thereof, on the 24th day of January, 1866, patent issued to plaintiff and his wife for said land claim—the east half to plaintiff, and the west half to his wife. Here was a transaction, as appears upon the face of the complaint, intended by the parties to put an end to all their disputes, and to make a full and final division of all said land claim, the plaintiff and his wife conveying by warranty deeds directly to Welch and Nancy Welch, his wife, specific property without qualification or reservation, and Welch, in pursuance of their agreement abandoning his contest and permitting plaintiff and wife to secure a patent to the same, the boundary of which, on the Columbia river, they were bound to know was the line of ordinary high water. But the appellant claims that the fair presumption in regard to the settlement of 1860 is, that Welch was dealing with his contract rights, and that the deed to Mrs. Welch was without consideration from her, but a gift from her husband, and that as such it comes to her in equity and good conscience transmitted with their contract rights. But it seems to us the presumption is much stronger upon the facts and circumstances under which these deeds are alleged to have been executed—the quantity of land conveyed to Mrs. Welch, as compared with that conveyed to her husband—that Mrs. Welch took what was so conveyed to her in lieu of what her husband might have obtained for her under the donation law, had he not, in consideration of the warranty deeds of 1860, abandoned his claim and contest to have the same conveyed to him by the

government. And in such case, it seems to us, that equity and justice would require that Mrs. Welch should hold her shares unaffected by her husband's contracts, in like manner as if the same had been granted to her by the United States. It is not questioned but that the tide lands belong to the state, and that she has the undoubted right to sell or to refuse to sell them, as she may deem best; or, if so disposed, the right and authority to designate the persons, or classes of persons, "*authorized to purchase*" the same. In the act of 1872, the owner of property fronting or abutting upon the shore in front of which the tide lands lie, have such right of purchase, and Mrs. Welch, or those claiming under her, belonging to this class, have obtained the deed of the state to the lands in controversy, and we see nothing in the facts as presented by the complaint, which would require a court of equity to fasten upon the conscience of the defendants and convert them into trustees for the benefit of plaintiff. The decree of the court below is affirmed.

Decree affirmed.